UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JACKIE SPENCER | ) | CASE NO. 1:14CV354 |
| | ) | |
| Plaintiff | ) | MAGISTRATE JUDGE |
| | ) | GEORGE J. LIMBERT |
| v. | ) | |
| | ) | **MEMORANDUM AND OPINION** |
| CAROLYN W. COLVIN, | ) | |
| ACTING COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION | ) | |
| | ) | |
| | ) | |
| Defendant | ) | |

Plaintiff requests judicial review of the final decision of the Commissioner of Social Security denying Jackie Spencer Disability Insurance Benefits (DIB). The Plaintiff asserts that the Administrative Law Judge (ALJ) erred in his August 17, 2012 decision in finding that Plaintiff was not disabled because he could perform a significant number of jobs that exist in the national economy, such as a dishwasher, laundry worker, and cleaner (Tr. 30-45). The Court finds that substantial evidence supports the ALJ's decision for the following reasons:

## I.    PROCEDURAL HISTORY

Plaintiff applied for Disability Insurance Benefits (DIB) in December 2009 (Tr. 290-291). He alleged disability as of December 17, 2007 (Tr. 290). The agency denied his application initially (Tr. 207-210), and on reconsideration (Tr. 215-217). Plaintiff requested a hearing (Tr. 222-223), and he

appeared and testified before ALJ Mike Dixon on August 9, 2011 (Tr. 110-134).  Carol Mosley testified as a vocational expert (Tr. 134-140).  On August 24, 2011, the ALJ found Plaintiff not disabled because he could perform his past relevant work as a bellman or as a cleaner (Tr. 18-97). Plaintiff requested Appeals Council review, and on February 2, 2012, the Appeals Council granted his request (Tr. 204-205).  The Appeals Council identified two specific errors.  It observed that, although the ALJ had identified moderate difficulties in social functioning, the ALJ had not accounted for those difficulties in his residual functional capacity (RFC) finding or in the hypothetical questions that he posed to the vocational expert (Tr. 204).  The Appeals Council also found error in the ALJ's step four finding, noting that although the ALJ had limited Plaintiff to medium work, the *Dictionary of Occupational Titles* (DOT) identified both the jobs the ALJ found Plaintiff could perform as heavy jobs (Tr. 204-205).

On May 22, 2012, Plaintiff appeared and testified before ALJ Thomas Randazzo (Tr. 53-80). Brett Salkin testified as a vocational expert (Tr. 80-94).  On August 17, 2012, ALJ Randazzo found Plaintiff disabled because he could perform a significant number of medium jobs, including jobs as a dishwasher and laundry worker (Tr. 30-45).

Plaintiff again requested Appeals Council review (Tr. 21).  On August 3, 2013, Plaintiff's representative wrote to the Appeals Council and requested his prior record (Tr. 8).  The representative explained that she was doing so because Plaintiff told her that he had received benefits between 1999 and 2009, but had voluntarily terminated benefits (Tr. 8). On December 20, 2013, the Appeals Council acknowledged the receipt of additional records from Plaintiff, including three sets of records from the Cleveland Clinic, dated July 27, 2012-August 10, 2012; August 7, 2012-September 11, 2012; and June 23, 2012-March 22, 2013 (Tr. 6).

2

Thereafter, the Appeals Council declined Plaintiff's request for review on December 20, 2012 (Tr. 1-4). The Appeals Council stated that it had considered the representative's statement about Plaintiff voluntarily ceasing benefits (Tr. 2). The Appeals Council, however, reported that their records showed that the agency ceased benefits in 2004, due to Plaintiff's failure to cooperate with a continuing disability review (Tr. 2). The Appeals Council also considered the newly-submitted evidence, but found that it pertained to a time after August 17, 2012, the date of the ALJ's decision (Tr. 2). The Appeals Council explained that if Plaintiff believed he was disabled after that date, he should file a new application (Tr. 2). This denial rendered ALJ Randazzo's decision as the Commissioner's final decision in this case. Plaintiff now seeks judicial review of the Commissioner's decision pursuant to 42 U.S.C. Section 405(g).

## II.    STATEMENT OF FACTS

Plaintiff was born on October 20, 1972, and was thirty-five years old on the alleged onset date of disability (Tr. 44, 161). He was placed in special education classes in school after failing second grade, and continued to receive special education instruction until he graduated (Tr. 406-425, 568). His past relevant work includes work as a bellman, commercial cleaner, and a warehouse worker (Tr. 61-62, 67, 71-74, 343-350).

## III.   SUMMARY OF MEDICAL EVIDENCE

Plaintiff alleges disability due to epilepsy, back pain status post lumbar strain/sprain with degenerative disc disease of the lumbar and cervical spine, and mental conditions, which include depression, PTSD, adjustment disorder, and borderline personality disorder (Tr. 437, 504-509, 536,

568-572, 591, 598, 632, 651, 752-757, 783-788, 858-859, 861-879, 931-933, 952-955, 999, 1099, 1103-1107, 1119, 1158-1167).  Following an injury to his low back on August 5, 2007, Plaintiff participated in six weeks of physical therapy (Tr. 431-436, 440).  He returned to physical therapy in August 2008 with decreased core stability and reduced lifting capacity, due to chronic herniated nucleus palposus with left lower extremity radiculopathy (Tr. 437).  At that time, he could sit for fifteen minutes and stand for ten minutes, and was unable to work (Tr. 437).  Testing revealed reduced lumbosacral range of motion with extension and flexion at fifty percent of normal, and rotation and side bend at seventy-five percent of normal (Tr. 438).

On December 31, 2008, Plaintiff was on a bus involved in a motor vehicle accident and thrust forward, which exacerbated his low back pain (Tr. 456).  Following the crash, he presented for emergency treatment at Carolinas Medical Center, and received pain medication for a lumbar strain (Tr. 504-509, 752-757, 783-788).  He reported pain in his low back and neck (Tr. 509).  In January 2009, Dr. Blake Prelipp provided chiropractic treatment for Plaintiff's pain in his low back, arms, and legs (Tr. 456-473).

Plaintiff returned to Carolinas Medical Center's emergency department with complaints of right shoulder pain on March 30, 2010 (Tr. 526, 817-832).  The x-rays of his right shoulder showed normal results, and the emergency physician diagnosed muscle strain, and recommended rest, ice, and anti-inflammatory medication (Tr. 527, 530).  During the examination, Plaintiff admitted to experiencing two breakthrough seizures in the past week, despite medication compliance, which he reported as typical for him (Tr. 528).

On May 5, 2010, Dr. Lori Schneider, M.D., a consultative examiner for the Social Security Administration, evaluated Plaintiff (Tr. 534-536).  No medical records were provided to the Doctor,

but Plaintiff provided his medical history, reporting a history of seizures since age eight, when he suffered a blunt head trauma, and chronic low back pain since a work injury in 2007, with a history of left L3 nerve root compression (Tr. 534-535). On examination, Dr. Schneider observed positive straight leg raise testing at forty-five degrees bilaterally, left worse than right, with normal sensation, reflexes, and gait (Tr. 535). Dr. Schneider diagnosed epilepsy with history of generalized seizures with loss of consciousness occurring every one to two months, and chronic low back pain with a prior history of left L3 radiculopathy (Tr. 536). The Doctor recommended an adjustment to his seizure medication, and also pointed out that his pain medication could be exacerbating his seizures (Tr. 535-536). She concluded that Plaintiff is unable to lift heavy objects and has no significant difficulty standing or walking, despite his reports that walking exacerbates his pain (Tr. 536).

In June 2010, Plaintiff presented to University Hospitals' emergency department, and reported he had been out of his seizure medication for several weeks and had experienced two seizures that day (Tr. 543). Dr. David Cheng refilled Plaintiff's seizure medication, and gave him Ativan for anxiety (Tr. 544). The following month, Plaintiff sought treatment at Hillcrest Hospital for depression and a suicide attempt, after he tried to overdose on Xanax (Tr. 861-879, 1103-1107). The emergency physician observed flat affect, diagnosed depression and suicide attempt, and assigned a global assessment of functioning (GAF) score of thirty-five (Tr. 861-865, 877-879). Plaintiff also showed poor eye contact, constricted and blunted mood and affect, flight of ideas, impaired judgment, and distractible concentration (Tr. 877). In August 2010, he returned to Hillcrest Hospital after a seizure with postictal confusion and complaints of neck pain and headache (Tr. 553). The emergency physician observed a tongue abrasion consistent with his report that he bit his tongue during the seizure, and also noted pallor skin (Tr. 553-554). The Doctor diagnosed chronic seizure, which he

5

attributed to medication non-compliance, and advised him not to drive (Tr. 554, 558-559).

In October 2010, Plaintiff presented to University Hospitals' emergency department after experiencing a headache, an episode of urinary incontinence, and feeling "out of it," which he attributed to a seizure (Tr. 858). He also reported his chronic low back pain had been "out of control" (Tr. 858). He reported compliance with his seizure medication, and his Dilantin level was 3.0 (Tr. 858). The emergency physician, Dr. Viera-Ortiz, M.D., observed him in a postictal state, noting he was sleepy but arousable, and his basic metabolic panel showed results consistent with a recent seizure (Tr. 858-859).

On November 20, 2010, Plaintiff called 911 and reported suicidal ideations (Tr. 624-634). He received emergency treatment at Lutheran Hospital and St. Vincent Charity Hospital (Tr. 625-634). The emergency physician at St. Vincent Charity Hospital diagnosed adjustment disorder, and assigned a GAF score of fifty-five (Tr. 632).

On December 14, 2010, Richard C. Halas, M.A. completed a psychological consultative examination for the Social Security Administration (Tr. 568-572). Plaintiff reported that he had been placed in special education classes when he failed second grade, and remained in special education classes until he graduated in 1991 (Tr. 568). Mr. Halas described Plaintiff as flat, hesitant and tentative with marked poverty of speech, poor eye contact, and a tendency to minimize problems (Tr. 569-570). Plaintiff reported experiencing poor sleep, poor appetite, poor energy, and crying spells, and the examiner observed tearfulness and psychomotor retardation during the evaluation (Tr. 570). He takes naps during the day (Tr. 570). On cognitive testing, he was unable to complete simple calculations or serial 7's (Tr. 570). The clinical psychologist diagnosed PTSD, major depression, recurrent type, borderline personality disorder, and assigned a GAF score of forty-five to indicate serious symptoms

6

and serious functional limitations (Tr. 571).  Mr. Halas concluded that Plaintiff would have mild limitations following simple instructions, moderate limitations in maintaining attention and concentration, and marked limitations in relating with co-workers and supervisors, and withstanding stress and pressure of day-to-day work activities (Tr. 572).

A medical consultant for the Social Security Administration, David Dietz, Ph.D., reviewed the medical evidence, including the psychological evaluation by the consultative examiner on reconsideration (Tr. 171-183). He concluded that Plaintiff has moderate limitations in maintaining social functioning, moderate limitations in maintaining concentration, persistence, or pace, and mild restriction on activities of daily living (Tr. 176).  He also found Plaintiff moderately limited in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, and interact appropriately with the general public (Tr. 181). The medical consultant restricted Plaintiff to three- to four-step tasks without strict production standards or schedules in an environment with no more than superficial social interactions (Tr. 181). Physically, another medical consultant, Dr. W. Jerry McCloud, M.D., restricted Plaintiff to lifting fifty pounds occasionally and twenty-five pounds frequently, with the ability to sit, stand, and walk for up to six hours each with normal breaks (Tr. 178).  Dr. McCloud also precluded Plaintiff from climbing ladders, ropes, or scaffolds, and from all exposure to hazards (Tr. 179-180).

In January 2011, EMS brought Plaintiff to South Pointe Hospital after bystanders witnessed a seizure (Tr. 651).  Witnesses reported the seizure lasted one minute, and he remained unresponsive for fifteen minutes until EMS arrived (Tr. 651).  He also experienced urinary incontinence, a headache, and confusion due to the seizure (Tr. 651).  The emergency department physician who examined Plaintiff observed that he was in a postictal state (Tr. 651).  Plaintiff admitted he had run

out of Dilantin one week prior (Tr. 651).

On February 8, 2011, Plaintiff presented to the Cleveland Clinic's emergency department with complaints of a lump on his right leg (Tr. 584). He explained he had suffered a seizure four days earlier, and was unsure if he hit his leg on something during the seizure (Tr. 584). An ultrasound of Plaintiff's right thigh showed subcutaneous edema (Tr. 573). He followed up with a neurologist, Dr. Nancy Schaefer, D.O., on February 15, 2011, and reported seizures occur approximately once per month and seemed related to stress (Tr. 587, 590-591). He also admitted to missing medications (Tr. 590). His seizures are preceded by a headache and a restless feeling, and then he convulses, bites his tongue, and becomes incontinent (Tr. 590). Dr. Schaefer diagnosed focal epilepsy due to closed head injury and depression with history of suicide attempts (Tr. 591). The Doctor advised Plaintiff to avoid heights and driving (Tr. 591). Dr. Schaefer ordered an MRI of Plaintiff's brain and an EEG, which showed no abnormality (Tr. 603, 606). When Plaintiff returned to Dr. Schaefer in March 2011, he reported he had been taking medication as prescribed without missed doses, and was experiencing increased fatigue (Tr. 613).

Plaintiff also followed up with Cleveland Clinic's spine center in February 2011 (Tr. 597). Dr. Tagreed Khalaf, M.D. evaluated Plaintiff's complaints of low back and left leg pain which worsened with standing (Tr. 597). Dr. Khalaf diagnosed chronic low back pain with left lower extremity pain most consistent in an L5 radicular pattern, and referred Plaintiff for x-rays and physical therapy (Tr. 598). When Plaintiff returned to Dr. Khalaf in May 2011, he reported his pain worsened with sitting, standing, and lifting, and his low back pain had been worse for the past week because he had walked eight miles to church (Tr. 928). He rated his pain at 6.5 out of 10, and reported physical therapy did not relieve his symptoms (Tr. 928). Dr. Khalaf ordered an x-ray of his lumbar spine, which

8

was normal, and an MRI of his lumbar spine, which showed mild degenerative disc disease at L3-4 and L4-5 and moderate neural foraminal stenosis due to endplate hypertrophy at right L4-5 (Tr. 931-933).  At a follow-up visit in June 2011, Dr. Khalaf ordered an EMG because his symptoms were contralateral to the neural foraminal stenosis, but the EMG was also normal (Tr. 948, 1010).  An x-ray of his lumbar spine performed in July 2011 showed mild degenerative changes at L5-S1 (Tr. 999). Dr. Khalaf also ordered an x-ray of his cervical spine in January 2012, which showed mild multilevel degenerative disc disease (Tr. 984).

Plaintiff began treatment with Cleveland Clinic's pain management department in June 2011 for his low back pain (Tr. 942-944).  He also reported upper back pain, which radiated into his left arm to the fingers (Tr. 942). Dr. Beth H. Minzter, M.D. found positive straight leg raise testing on the left both sitting and supine and positive FABER testing on the left localizing to the groin (Tr. 943). After reviewing his MRI results, Dr. Minzter diagnosed low back pain consistent with degenerative disc disease and radicular pain, and concluded that he is at risk for falls due to left-sided numbness (Tr. 952-955). Dr. Minzter performed left L5 transforaminal epidural steroid injections on June 24, 2011, August 12, 2011, and December 28, 2011 (Tr. 956, 962, 970).

Plaintiff received crisis treatment from Mental Health Services during an emergency department visit in September 2011 (Tr. 1097-1107).  He reported depression, fatigue, insomnia, and diminished concentration (Tr. 1099).  At intake, the therapist reviewed his hospital chart, noting he had a seizure in the waiting area and woke up in the emergency room (Tr. 1098).  He admitted to overdosing on Dilantin, although his levels were therapeutic, not supratherapeutic (Tr. 1098). He also admitted to getting kicked out of homeless shelters, due to fighting and banging his head on the side of the building (Tr. 1098).

9

In April 2012, Plaintiff presented for admission to Cleveland Clinic's neurology service for one week of video EEG monitoring (Tr. 1024-1027, 1028-1096). Plaintiff reported he experiences two to five seizures per month, marked by loss of consciousness and staring spells, with accompanying motor activity followed by confusion and dizziness approximately one-third of the time (Tr. 1025). Plaintiff has injured himself and lost teeth due to his seizures (Tr. 1025). The study revealed nonepileptiform interictal abnormalities described as generalized intermittent slow waves consistent with mild to moderate diffuse encephalopathy, but no clear evidence of active epilepsy (Tr. 1026-1027, 1085). He followed up with Dr. Schaefer in June 2012, and his significant other reported he experiences a seizure every few weeks (Tr. 1108). Dr. Schaefer reviewed his MRI from May 2012, which showed hyperintensity in the right medial temporal and insular region (Tr. 1108, 1340).

Plaintiff returned to the Cleveland Clinic for admission from June 23, 2012 to June 27, 2012 for additional EEG testing and surgical evaluation (Tr. 1155-1179, 1229-1238). During admission, he experienced three secondarily-generalized seizures with right frontotemporal onset (Tr. 1158, 1167). His seizures were refractory to medical therapy (Tr. 1158, 1167). He became shaky, incontinent, and sleepy during the seizures, and he reported extreme headache and nausea afterwards (Tr. 1172-1173). Upon discharge, Dr. Andreas V. Alexopoulos, M.D. reminded him of his seizure-related precautions, including no driving, no exposure to heights, sharp objects, moving objects, or heavy machinery, and to use caution with all water activities (Tr. 1158). Plaintiff underwent a PET scan of his brain on July 2, 2012, which showed bilateral anterior and medial temporal hypometabolism, right worse than left, and mild asymmetrical hypometabolism of the right lateral temporoparietal region (Tr. 1140). An EEG performed on the same date showed intermittent slow generalized waves consistent with the diagnosis of mild diffuse encephalopathy (Tr. 1143).

10

In June 2012, Plaintiff returned to his pain management specialist, Dr. Minzter, M.D., with complaints of recurrent low back pain (Tr. 1112).  He reported the prior injections had provided twenty-five percent relief, which lasted two weeks (Tr. 1112). Dr. Minzter observed positive straight leg raise testing on the left, and diagnosed degenerative disc disease and lumbar radiculopathy (Tr. 1113).  The Doctor referred Plaintiff for physical therapy, with a plan to perform additional injections if physical therapy did not help (Tr. 1113). He began physical therapy on July 15, 2012, and reported his low back and left leg pain becomes exacerbated by standing for twenty minutes and sitting for ten minutes (Tr. 1122-1123).  He continued physical therapy treatment for left-sided back pain until August 2012, when he had to postpone physical therapy so he could undergo surgery for his epilepsy (Tr. 1133-1137, 1181-1197).

In preparation for neurosurgery for his seizure disorder, Plaintiff underwent a psychiatric evaluation with Dr. George E. Tesar, M.D. in July 2012 (Tr. 117).  Dr. Tesar noted Plaintiff was wearing an EEG device, and observed that his right hand movements were slower and dysmmetric compared to the left (Tr. 1118). Dr. Tesar diagnosed mild cognitive impairment with history of postictal agitation and question of organic personality elements, and assigned a GAF score of 69 (Tr. 1119).  Another doctor, Richard I. Naugle, Ph.D., conducted a neuropsychological examination of Plaintiff in July 2012 (Tr. 1129-1131).  During the examination, Plaintiff demonstrated tangential and confused thought processes, which were difficult for the examiner to follow (Tr. 1129).  Dr. Naugle concluded that Plaintiff worked to the best of his ability, but quickly became quite drowsy and even dozed off during some tasks and became easily confused by longer and more complex instructions (Tr. 1129).  On WAIS-III testing, Plaintiff attained borderline to low average scores, with lower scores on tasks that required sustained attention and concentration, and working memory scores in the extremely

11

low range (Tr. 1130). The examiner expressed caution about the reliability of the test results, due to Plaintiff's drowsiness, but concluded the results as a whole demonstrate bilateral multilevel dysfunction (Tr. 1130).  The Doctor also concluded that a nondominant temporal resection had a low likelihood of resulting in postoperative cognitive changes (Tr. 1130).

In August 2012, Dr. William Bingaman, M.D. diagnosed Plaintiff with right temporal lobe epilepsy, as supported by objective test results, and scheduled him for a right temporal lobe lobectomy (Tr. 1218-1221).  Dr. Bingaman recommended surgery because Plaintiff continued to experience an average of two to three seizures per month, despite medication compliance (Tr. 1218-1221). On August 20, 2012, Dr. William Bingaman, M.D. performed a right temporal lobectomy for Plaintiff's medically-intractable temporal lobe epilepsy (Tr. 1198-1209).  Plaintiff remained hospitalized until August 24, 2012, and complained of headaches and nausea during his admission (Tr. 1198-1209). When he returned to Dr. Bingaman postoperatively, he had been seizure free since his surgery six weeks earlier (Tr. 1305).  In November 2012, Dr. Schaefer continued his restrictions from driving, and provided a letter for his caseworker, due to legitimate concerns about his safety because he lives alone and was recovering from brain surgery, with no recurrence of seizures, but worsened insomnia since the surgery (Tr. 1325-1327).

## IV.  SUMMARY OF TESTIMONY

At the August 9, 2011 hearing, the ALJ established that Plaintiff was a younger individual with some college education (Tr. 115). The ALJ noted a previous application that resulted in benefits for Plaintiff, but observed that the agency terminated the benefits due to spousal income (Tr. 115). Plaintiff indicated that this was correct (Tr. 115).  Plaintiff could not identify anything significant that

12

happened on December 17, 2007, his alleged disability onset date (Tr. 116).  The ALJ and Plaintiff discussed the work he performed in 2007-08, but they agreed that he did not perform substantial gainful activity during those years (Tr. 117-119).

Plaintiff testified that he was unable to work due to seizures, depression, and a pinched nerve in his lower back (Tr. 120).  Plaintiff said he suffered a seizure the week prior to the hearing, and had to go to Charity Hospital (Tr. 120).  Plaintiff acknowledged that he had an arrest for writing a bad check, but stated that he had the arrest expunged from his record (Tr. 123).  The ALJ referred to a positive result on an alcohol screening test from 2011, but Plaintiff responded that such a result could not be correct (Tr. 124).

When the ALJ asked about issues with medication compliance, Plaintiff responded that he did have some problems after he relocated to Ohio (Tr. 124). He said that between working and other activities, he simply forgot to take the medications, once every six hours (Tr. 124-125), so his doctor advised him to just take all four pills when he went to bed, and Plaintiff said he now had that issue under control (Tr. 125).  When Plaintiff's representative asked him about the frequency of his seizures, he responded that if he was not taking medications, he would have one daily (Tr. 133). Plaintiff, however, then testified that if he was taking his medications as prescribed, he would not have any seizures (Tr. 133).

At the second hearing held before ALJ Randazzo on May 22, 2012, Plaintiff suggested he could perform a part-time job, working approximately twelve hours a week (Tr. 67).  Plaintiff said he could not work longer hours, due to neck and lower back pain (Tr. 67). Plaintiff testified that even with taking Dilantin, it was not guaranteed that he would be seizure-free (Tr. 69).  He added that he had suffered some recent seizures, and had to spend a week in the hospital (Tr. 69).  Plaintiff estimated that if he were under stress, he would have two seizures each month (Tr. 70).  However, Plaintiff added that if he was not under stress, he might not have any seizures (Tr. 70).

13

Thereafter, the ALJ posed a number of hypothetical questions to vocational expert, Brett Salken. The ALJ ultimately found that Plaintiff could perform a significant number of medium jobs. The ALJ asked about a younger person with some college and the same past work as Plaintiff (Tr. 85). This person could perform medium work and could stand for six hours and/or sit for six hours each day (Tr. 85). This person could not climb ladders, ropes, or scaffolds, but could engage in frequent bending, stooping, kneeling, crouching, and crawling (Tr. 85). He needed to avoid all exposure to hazardous machinery or unprotected heights (Tr. 85). Before adding in non-exertional limitations, the ALJ noted that in his testimony, Plaintiff stated that he did not have concentration problems (Tr. 85).

The ALJ added that this person would be limited to superficial interaction with co-workers and the general public (Tr. 85). This person could not engage in tasks that involved arbitration, negotiation, or confrontation (Tr. 86). In response, the vocational expert testified that the hypothetical person could work as a dishwasher (3,000 local jobs), packager (7,500 local jobs), and laundry worker (8,400 local jobs (Tr. 86).

In another hypothetical question, the ALJ retained all the factors outlined above, and also asked the vocational expert to consider that this person would be limited to simple, routine work that did not have production quotas or strict time requirements (Tr. 87). In response, the vocational expert eliminated the packager job, but stated that this person could perform the dishwasher and laundry worker jobs described above (Tr. 87).


**V.      STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS**

An ALJ must proceed through the required sequential steps for evaluating entitlement to disability insurance benefits. These steps are:

1.      An individual who is working and engaging in substantial gainful

activity will not be found to be "disabled" regardless of medical findings (Sections 20 C.F.R. 404.1520(b) and 416.920(b) (1992);

2. An individual who does not have a "severe impairment" will not be found  to be "disabled" (Sections 20 C.F.R. 404.1520(c) and 416.920(c)(1992);

3. If an individual is not working and is suffering from a severe impairment  which meets the duration requirement, *see* Sections 20 C.F.R. 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in Sections 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (Sections 20 C.F.R. 404.1520(d)  and 416.920(d) (1992);

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (Sections 20 C.F.R. 404.1520(e) and 416.920(e) (1992);

5. If an individual's impairment is so severe as to preclude the performance  of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (Sections 20 C.F.R. 404.1520(f) and 416.920(f) (1992).

*Hogg v. Sullivan,* 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has the burden at Step Five to show that alternate jobs in the economy are available to the claimant, considering his age, education, past work experience and residual functional capacity.  *See, Moon v. Sullivan,* 923 F.2d 1175, 1181 (6th Cir. 1990).

## VI.    STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by Section  205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. Section 405(g).

15

Therefore, this Court is limited to determining whether substantial evidence supports the Commissioner's findings and whether the Commissioner applied the correct legal standards. *See, Abbott v. Sullivan,* 905 F.2d 918, 922 (6th Cir. 1990). The Court cannot reverse the ALJ's decision, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *See, Walters v. Commissioner of Social Security,* 127 F.3d 525., 528 (6th Cir. 1997). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *See, Richardson v. Perales,* 402 U.S. 389, 401 (1971). It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *See, id., Walters,* 127 F.3d 525, 532 (6th Cir. 1997). Substantiality is based upon the record taken as a whole. *See, Houston v. Secretary of Health and Human Servs.,* 736 F.2d 365 (6th Cir. 1984).

## VII.   ANALYSIS

Plaintiff asserts two issues:

A.    WHETHER THE ALJ'S DECISION LACKS SUBSTANTIAL EVIDENCE BECAUSE HE MISAPPLIED LISTING 11.02 AND FAILED TO EVALUATE LISTING 11.03.

B.    WHETHER THE ALJ'S DECISION LACKS SUBSTANTIAL EVIDENCE BECAUSE HE RELIED ON INCOMPLETE VOCATIONAL EXPERT TESTIMONY TO FIND PLAINTIFF NOT DISABLED.

Plaintiff contends that the ALJ erred in finding that his epilepsy did not meet or equal the criteria of an impairment included in the Listing of Impairments. Certain impairments, included in the Listing of Impairments, are considered disabling regardless of an individual's age, education, or work experience. 20 C.F.R. Sections 416.920(d), 416.925(a); 20 C.F.R. part 404, subpart P, App. 1. "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Sullivan v. Zebely,* 493 U.S. 521, 530 (1990). There are two listings that pertain to epilepsy,

11.02 and 11.03.  Both require that a claimant's seizures occur in spite of at least three months of prescribed treatment.  Moreover, for Listing 11.02, the seizures must occur on a monthly basis, whereas for the petit mal seizures contemplated in Listing 11.03, the seizures must occur more than once weekly.  Plaintiff cannot show any period of time where he followed treatment for three months, nor can he show, if one ignored his non-compliance, that his seizures occurred as frequently as required by either listing.  Hence, Plaintiff cannot sustain his burden of proving that all of the listing criteria for either 11.02 or 11.03 were satisfied.  *See, Roby v. Comm'r of Soc. Sec.*, 48 Fed. App'x. 532, 536 (6th Cir. 2002) ("The claimant has the burden at the third step of the sequential evaluation to establish that he meets or equals a listed impairment.

Plaintiff argues that his medical records establish that he experiences two to five seizures each month with the "motor activity" typical of convulsive seizures occurring approximately one-third of the time.  Plaintiff's Brief at 3.  In support of his contention, he cited three medical records.  However, none of these three citations support his assertions. One of the records Plaintiff cited is a report from June 30, 2010 that recounted a hospital visit in which Plaintiff reported that two seizures occurred on that day (Tr. 543).  Yet, Plaintiff acknowledged that he had been out of his seizure medication, Zonegran, for several weeks when these seizures occurred (Tr. 543).  Hence, this is not an example of a seizure occurring during the time claimant took his prescribed treatment.

Plaintiff's second citation refers to an April 17, 2012 encounter wherein he stated that he missed his medications on a regular basis (Tr. 1025).  This record supports the contention that this record cannot support either listing.  The record he cited does not support his assertion, since he admitted not taking his medication regularly (Tr. 1025).

Plaintiff's third citation to support his contentions about seizures occurring frequently is to a record he submitted to the Appeals Council after the ALJ issued his decision.  Plaintiff's Brief at 18, citing Tr. 1218-1221. However, the undersigned will not consider this evidence. *See, Foster v. Halter*,

17

279 F.3d 348, 357 (6th Cir. 2001). Hence, the three references in the record by Plaintiff do not support his seizures on a regular basis, while the third cannot be considered by the Court.

Furthermore, none of the reports that Plaintiff recited support the contention by Plaintiff that he had seizures on a monthly basis during the period at issue. Plaintiff alleged a disability onset date in December 2007, but the record contains no reports of a seizure until a March 2010 report (Tr. 526). Plaintiff's records do not contain any reports of seizure activity in 2008 or 2009. After reporting seizure activity in March and June 2010, Plaintiff thereafter reported another seizure in August 2010. However, the medical records noted his non-compliance with medications (Tr. 554). Plaintiff reported another seizure in October 2010 (Tr. 858), and another seizure in January 2011 (Tr. 651). For 2010, Plaintiff reported seizures in March, June (2), August, and October. These examples of seizures do not support monthly occurrences as required by Listing 11.02.

When Plaintiff reported a seizure in February 2011, he again admitted not taking his medications (Tr. 590). The next seizure occurred in September 2011 (Tr. 1098). Plaintiff's Brief at 11. Furthermore, he can only demonstrate seven or eight seizures over a fifteen month period (June 2010-September 2011). The listing in question, 11.02,, requires seizures occurring on a monthly basis, and Plaintiff cannot show that he had seizures as frequently as required to meet or equal Listing 11.02.

Next, Plaintiff argues that the ALJ misread the listing requirements to require both daytime and nighttime seizures. Plaintiff Brief at 17. However, Plaintiff concedes that "Listing 11.02 addresses convulsive epilepsy and requires that seizures occur more frequently than once a month in spite of at least three months of prescribed treatment." Plaintiff's Brief at 17. Since Plaintiff cannot show that his seizures occurred more frequently than once a month, he has not met or equaled this listing. In fact, Plaintiff acknowledged that the evidence is lacking in his case, as he stated that such evidence "would need to be further explored" to see if his convulsive seizures occurred two to five times each month, or if his non-convulsive seizures occurred more than once each week. Plaintiff's Brief at 18.

This record establishes that between December 2007 and April 2012, Plaintiff did not have convulsive seizures more than once each month.

Plaintiff also argues that the ALJ erred by "placing undue focus on earlier reports of noncompliance with medication..." Plaintiff's Brief at 17. Plaintiff has alleged disability since December 17, 2007, and as recently as April 12, 2012, his treating physician, Dr. Schaefer, commented that Plaintiff admitted to missing his medications regularly (Tr. 1025). Plaintiff has continued to not comply with taking medication.

Plaintiff also argues that his impairments are equivalent to a listed impairment. A claimant's impairment is medically equivalent to a listed impairment if it is at least equal in severity and duration to the requirements of a listed impairment. 20 C.F.R. Section 404.1526(a). Plaintiff contends that any finding pertaining to equivalency requires an opinion from a physician designated by the Commissioner. Plaintiff argues that the ALJ's finding is defective because he submitted significant evidence after January 2011 (the last date a physician designated by the Commissioner reviewed the record), and that his case should be remanded so that a medical expert can review this (new) evidence. Plaintiff's Brief at 18-19.

However, the evidence submitted after January 2011 consists of Dr. Schaefer's treatment records. That Doctor stated that Plaintiff did not follow prescribed treatment, as Dr. Schaefer noted on April 17, 2011, that Plaintiff admitted to frequently missing his medications (Tr. 1025). Furthermore, two of the records cited by Plaintiff in support of his equivalence argument (Tr. 1198-1209 and 1229-1238) consist of evidence that was not before the ALJ and was submitted to the Appeals Council after the ALJ issued his decision. This evidence will not be considered by the Court in reviewing the evidence.

When the Appeals Council remanded the decision of ALJ Dixon, it assigned error because, although the ALJ found that Plaintiff had moderate limitations in social functioning, he did not include

19

limitations in social functioning in his residual functional capacity (RFC) finding.  In addition, the previous ALJ did not include limitations on social functioning in the hypothetical question(s) he posed to the vocational expert (Tr. 204).  At the beginning of the hearing before ALJ Randazzo, he noted the Appeals Council's concerns, and stated that he would be sure to include limitations in social functioning in his RFC finding and in his hypothetical questions (Tr. 54).  In his brief, Plaintiff acknowledges that ALJ Randazzo did account for limitations in social functioning.  Plaintiff's Brief at 20.  Nevertheless, Plaintiff argues that the ALJ failed to include restrictions in his RFC finding that would account for his limitations in concentration.  Plaintiff's Brief at 20.

The Court finds that the ALJ considered Plaintiff's concentration problems by limiting him to simple and routine jobs that did not have strict time requirements or high production quotas (Tr. 36).  Plaintiff also contends that a limitation to unskilled jobs with limited contact with co-workers and the public is not sufficient to account for a claimant's moderate concentration problems.  However, the ALJ also precluded Plaintiff from performing tasks that involved high production quotas and strict time requirement (Tr. 36).  Therefore, the ALJ did account for Plaintiff's moderate concentration problems.

Next, Plaintiff contends that the ALJ erred because the ALJ did not fully accept the limitations set out by consultative examiner, Richard C. Halas, M.A., a clinical psychologist, who saw Plaintiff in December 2010 (Tr. 568-572).  While Mr. Halas opined that Plaintiff had mild and moderate functioning limitations with regard to following simple instructions and maintaining attention and concentration, Mr. Halas also opined that Plaintiff had marked limitations in terms of interacting with others and withstanding stress (Tr. 572).  Based upon substantial evidence, the ALJ correctly rejected the more extreme marked limitations found by Mr. Halas (Tr. 40).  The ALJ observed that Plaintiff worked after his alleged onset date, that he used public transportation, and that he interacted with his girlfriend (Tr. 40).  Plaintiff argues that the ALJ's observations pertain to his earlier functioning during

20

a prior time when he was not disabled.  Plaintiff's Brief at 21.  However, employment records showed that Plaintiff earned over $5,000 in 2008 (Tr. 296).  At his 2011 hearing, Plaintiff testified about interacting with his girlfriend (Tr. 64, 75), and he testified about using public transportation (Tr. 77). Therefore, this Court concludes that the ALJ relied on current evidence that contradicted Mr. Halas' extreme limitations.

Finally, the ALJ also relied on the opinion of state agency reviewer, David Dietz, Ph.D., who reviewed the record in January 2011 and considered Mr. Halas' report (Tr. 176-177).  Dr. Dietz found only moderate limitations in social functioning and in concentration (Tr. 176).  The ALJ assigned Dr. Dietz's opinion great weight (Tr. 40-41).  Hence, substantial evidence does not support Mr. Halas' findings of marked limitations.


**VIII.**  **CONCLUSION**

Based upon a review of the  record and law, the undersigned affirms the ALJ's decision. Substantial evidence supports the finding of the ALJ that Plaintiff retained the residual functional capacity (RFC) to perform a significant number of jobs that exist in the national economy, such as dishwasher, laundry worker, and cleaner, and, therefore, he was not disabled.  Hence, he is not entitled to DIB.


Dated: November 10, 2014                          */s/George J. Limbert*
                                                                 GEORGE J. LIMBERT
                                                                 UNITED STATES MAGISTRATE JUDGE